## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRY L. SHERMAN | : Civil No. 1:24-CV-203 |
| | : |
| Plaintiff | : |
| | : |
| v. | : |
| | : (Chief Magistrate Judge Bloom) |
| CAROLYN COLVIN, Acting | : |
| Commissioner of Social Security,[1] | : |
| | : |
| Defendant | : |

## MEMORANDUM OPINION

## I.  Introduction

On June 29, 2021, Terry Sherman filed an application for supplemental security income under Title XVI of the Social Security Act. (Tr. 149). Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Sherman was not disabled from her alleged onset of disability on May 1, 2021, through January 10, 2023, the date of the ALJ's decision. (Tr. 15-25).

---

[1] Carolyn Colvin became the Acting Commissioner of Social Security on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Carolyn Colvin is substituted as the defendant in this suit.

Sherman now appeals that decision, arguing the ALJ's decision is not supported by substantial evidence. (*See* Doc. 10). After a review of the record, we conclude that the ALJ's decision is supported by substantial evidence. Therefore, we will affirm the decision of the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

On June 29, 2021, Sherman applied for disability insurance benefits. (Tr. 18). She cited an array of physical and mental impairments allegedly entitling her to those benefits, including major depressive disorder, mild degenerative disc disease of the lumbar spine, and obesity. (Tr. 24). Sherman was 54 years old at the time of the alleged onset of disability, had at least a high school education, and has no past relevant work experience. (Tr. 30).

With respect to these alleged impairments, the record revealed that Sherman previously applied for disability insurance benefits, that application was denied, as was its appeal. *See Sherman v. Kijakazi*, No. 3:21-CV-717, 2022 WL 3567616 (M.D. Pa. Aug. 18, 2022). Two medical opinions originally generated for that case provide the earliest relevant

medical records for the instant appeal.  On January 5, 2018, state medical consultant Dr. Charles LaJeunesse reviewed Sherman's medical records. (Tr. 84-90).  While he noted that Sherman reported she "is paranoid and depressed [,]" he also stated there was "no evidence of . . . paranoia in the evaluation setting." (Tr. 89, 85).  As to her activities of daily living, Dr. LaJeunesse found that Sherman could dress, bathe, and groom herself, assist her boyfriend with the laundry, shopping, and management of money, could watch TV and listen to music, but that her boyfriend did most of their cooking and Sherman socialized only with him and her mother.  (Tr. 86).

Dr. Jennifer Betts, who also reviewed Sherman's medical records in conjunction with her initial application on August 30, 2019, did not find Sherman to be paranoid in the clinical sense, explaining that Sherman "primarily reported symptoms of social anxiety, though [Sherman] described the symptoms as paranoia."  (Tr. 79).  As to Sherman's activities of daily living, Dr. Betts concurred with Dr. LaJeunesse's findings, adding only that Sherman sometimes socialized with two of her neighbors.  (Tr. 79).

3

On April 23, 2020, Sherman treated with Community Counseling Services of Northeastern Pennsylvania ("CCS"). (Tr. 370). Sherman was a patient at CCS for 15 years. (Tr. 657). Certified Registered Nurse Practitioner ("CRNP") Kerri Netti's notes show that Sherman was complaining of anxiety in public places, was positive for paranoia, and "[f]eels people are talking about her [,]" but had a generally euthymic mood. (Tr. 370-72). She assessed Sherman with major depressive disorder with psychotic features. (Tr. 371).

Sherman visited Geisinger Medical Group's Kingston facility on May 19, 2020. (Tr. 515). There, she complained of acute pain in her right foot, lower back, and hip, and she was referred for x-rays and physical therapy. (Tr. 515, 518-19). Sherman checked into the emergency department at Geisinger Wyoming Valley on June 7, 2020, complaining of swelling in her right foot. (Tr. 509). She received x-rays of her chest and ankle, which Dr. Charles Brown noted were unremarkable. (Tr. 605, 608). A spinal x-ray was also performed on June 16, and Dr. Nicholas Pitzen found the imaging to be generally unremarkable. (Tr. 601).

Treatment notes from a July 7, 2020, telephone appointment with CCS indicated that Sherman's thought content was "relevant" and did not contain findings of paranoia. (Tr. 368). At another session on September 2, 2020, Sherman denied "significant anxiety" and "paranoia[.]" (Tr. 366). On December 29, 2020, Sherman had an intake session with Dr. Tatiana Figueredo at Geisinger, at which time a mental status examination revealed that Sherman was "alert, oriented to person, place, and time," and had a normal mood, affect, judgment, and memory. (Tr. 484).

Two weeks later, on January 13, 2021, Sherman's friend and neighbor Paul Ostaszewski initiated a wellness check on her, which resulted in the police bringing Sherman into the emergency department at Geisinger South Wilkes Barre ("GSWB"). (Tr. 436, 437). Sherman reported she was there for ear pain, but Dr. Bo Zhu noted that she was alert "to person and place, [but] not to time[.]" (Tr. 432). Dr. Zhu wrote that Sherman "can tell me her full name, knows she is in the hospital but cannot tell me the time/year. She thinks it is 2012." (Tr. 436). This began a weeklong hospital stay for Sherman, wherein multiple doctors opined

that at various times Sherman: could not recall her name, lacked capacity to make medical decisions, would stare in silence when presented with questions she could not answer, could not state where she was located, could not recall why she was in the hospital, and would sometimes become confused. (Tr. 441, 444 448, 456, 460, 465). Despite those symptoms, Dr. Michael Coffey found that because Sherman did "not exhibit overt delusions" she did not "meet criteria for psychiatric admission." (Tr. 464).

During her week at GSWB, Sherman received a CT scan, an ECG evaluation, and an MRI, all of which were generally unremarkable and failed to explain her condition, though Sherman did end the MRI early. (Tr. 428, 445, 572, 582). With time, the symptoms passed, and when Dr. Tina Hockenbury evaluated Sherman on January 19, she noted Sherman was "answering all questions appropriately." (Tr. 470). When she was released on January 20, Dr. Jennifer Hudson, Sherman's primary care provider, identified acute encephalopathy as the principal diagnosis. Dr. Hanson also noted that Sherman's left "leg has been numb and painful. She cannot even stand on it." (*Id.*).

6

On September 8, 2021, Sherman filled out a function report pursuant to her application for disability insurance. (Tr. 274). She stated that "depression impairs my attention and memory and decision making[,]" and identified PTSD as an issue. (*Id.*). As to her activities of daily living, Sherman explained that she could cook (slowly,) clean and do laundry (but it took "all day[,]") could shop on her phone, pay bills, handle savings, count change, use a checkbook, watch TV, and play games on the computer or phone to the point of losing concentration. (Tr. 274-83). She also stated she rarely went outside because of her paranoia. (Tr. 276). Regarding her physical impairments at this time, an x-ray of Sherman's spine in October of 2021 revealed mild spondylosis in the lumbar spine, and an increase in lumbar lordosis since her November 24, 2018, x-rays. (Tr. 390).

On October 21, 2021, Sherman underwent an internal medicine examination with CRNP Tara Cywinski. (Tr. 376). CRNP Cywinski recorded that Sherman had daily pain that radiated from her back to her hip and rated a seven out of ten, spiking to nine out of ten with increased exertion. (*Id.*). CRNP Cywinski ultimately diagnosed Sherman as

having chronic low back pain with left lower extremity radiculopathy and found minimal physical restrictions for Sherman outside of some standing, walking, and sitting limitations.  (Tr. 380-85).

On July 26, 2022, Sherman began therapy with Ms. Cecelia Gulius at Children's Service Center. ("CSC") (Tr. 703).  On September 22, at Sherman's second CSC session, Ms. Gulius noted that Sherman "reports that her paranoid [sic] has been getting worse . . . [is] staying in her home more due to paranoid thinking . . . [f]eels others are talking about her." (Tr. 706).  Sherman told Ms. Gulius that "she has lost 2 jobs recently due to her paranoia and social anxiety."  (Tr. 707).

On November 29, 2022, Ms. Gulius filled out a medical opinion form relating to Sherman's application for disability benefits.  (Tr. 783).  She found that Sherman had many "extreme" and "marked" limitations in her mental ability to work.  (*Id*).  Ms. Gulius explained that because of Sherman's "paranoia she frequently has had to take breaks in the past, would feel her co-workers were talking/plotting against her." (*Id*.).

It is against this factual backdrop that the ALJ conducted a hearing in Sherman's case on October 15, 2022.  Sherman and a vocational expert

both testified at this hearing. (Tr. 39-73). Following this hearing, on January 10, 2023, the ALJ issued a decision denying Sherman's application for benefits. (Tr. 18-31). In that decision, the ALJ first concluded that since Sherman's alleged onset of disability, she had not engaged in substantial gainful activity. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Sherman had the following severe impairments: major depressive disorder, mild degenerative disc disease of the lumbar spine, and obesity. (Tr. 20). The ALJ further concluded that while Sherman suffered from hearing loss and headaches, these impairments were non-severe. (*Id.*). At Step 3 the ALJ determined that these impairments did not meet or equal the severity of a listed impairment under the Commissioner's regulations. (Tr. 21).

Between Steps 3 and 4 the ALJ concluded that Sherman retained the residual functional capacity to:

> [P]erform medium work as defined in 20 CFR 416.967(c) except that the claimant is limited to frequent stooping, crouching, and use of ramps and climbing stairs, but occasional balancing, kneeling, and crawling and never climbing ladders, ropes, or scaffolds. The claimant can tolerate occasional exposure to vibration. The claimant can

perform jobs that would take no more than thirty days of training to learn with a specific vocational preparation (SVP) of 2, which are generally classified as unskilled. The claimant can understand, remember, and carry out simple instructions and perform simple, routine, repetitive tasks. The claimant can perform jobs that would be considered "low stress", in that they would involve only occasional, simple decision making and only occasional, gradual changes in the work duties and work setting. The claimant is limited to occasional exposure to customers and the general public.

(Tr. 24).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, the prior administrative medical findings, and Sherman's reported symptoms. (Tr. 24). As to Sherman's physical impairments, the ALJ found the opinion of Dr. Kathleen Sasnauskas, a state agency consultant, "persuasive, as it is consistent with the evidence of record." (Tr. 27). That opinion found Sherman capable of "a reduced range of medium exertion work that involves frequent postural maneuvers, but never climbing ladders, ropes, or scaffolds and avoids concentrated exposure to extreme cold and heat, wetness, humidity, noise, vibration, pulmonary irritants, and hazards [.]" (*Id.*). The ALJ stated that opinion was consistent with the evidence, which reflected:

> [V]ery limited treatment for complaints of back pain during
> the period at issue, only mild degenerative findings on
> diagnostic imaging, the claimant's ability to perform a wide
> variety of daily activities, and consultative examination
> findings that note antalgic gait, reduced squat, reduced
> lumbar range of motion, and positive straight leg raise testing
> on the right, but generally intact to only mildly reduced motor
> strength and sensation.

(*Id.*).

In contrast, the ALJ found the opinion of Dr. Crescenzo Calise, another state agency consultant, "not persuasive." (*Id.*). Dr. Calise opined that Sherman could lift and carry up to 25 pounds occasionally and frequently; frequently stoop, crouch, and climb ramps and stairs, but only occasionally balance, kneel, and crawl and never climb ladders, ropes, or scaffolds; has limited near and far acuity; and that she should avoid concentrated exposure to extreme cold and heat, wetness, humidity, noise, vibration, pulmonary irritants, and hazards. (Tr. 142-48). The ALJ found that this opinion was generally inconsistent with the evidence of record quoted above, as well as with Sherman's ophthalmological record. (Tr. 27).

As to Sherman's mental health impairments, the ALJ found the state agency opinions at both the initial and reconsideration level to be

11

"generally persuasive." (Tr. 28). The ALJ found those opinions to be "relatively consistent with the evidence of record [,]" which contained reports of "paranoia and ruminating or racing flow of thought [,]" yet "generally reflect[ed] reports of stable mood and intact memory skills, good concentration skills and attention span, coherent and goal directed thought processes, normal cognitive skills, good fund of knowledge[.]" (*Id.*). The ALJ also noted that the opinions were consistent with Sherman's medical records in that those records were "devoid of emergency room visits, participation in a partial hospitalization program, or inpatient hospitalizations." (*Id.*).

Although the ALJ determined Ms. Gulius was not an acceptable medical source, he considered her opinion and found it "not persuasive, as it is generally inconsistent with and not supported by the evidence." (Tr. 29). The ALJ found the opinion insufficiently supported as well, noting that while "the [CSC] treatment records themselves note the reports of paranoia . . . [those records] were otherwise within normal limits [and] are generally devoid of referrals for more intensive treatment." (*Id.*).

12

With respect to Sherman's symptoms the ALJ noted that while Sherman's "medically determinable impairments could reasonably be expected to cause the alleged symptoms [,]" that her "statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the medical evidence." (Tr. 25). As to her mental health, Sherman testified that her paranoia had led to her termination at her most recent job and had caused issues with at least one other job. (Tr. 50-51). She testified that she took Seroquel, Trazodone, Zoloft, and gabapentin, and that they helped her "sometimes[.]" (Tr. 53-54). Sherman reported that her lower back pain affected her ability to do household chores and other tasks. (Tr. 56-57).

The ALJ noted that with respect to her physical impairments, "in addition to [Sherman's] limited, routine, and conservative course of treatment" she had "retained the ability to perform a wide range of daily activities" including "light exercise." (*Id*). The ALJ held that despite Sherman's "statements about the intensity, persistence, and limiting effects of her symptoms, they do not support greater limitations than those accounted for herein [,]" and that the evidence supported the

13

physical limitations in the RFC. (Tr. 27). Regarding her alleged mental limitations, the ALJ determined that Sherman's reported symptoms were inconsistent with the lack of psychiatric inpatient hospitalizations, as well as with the treatment records showing the absence of paranoid symptoms. (Tr. 26).

At Step 4, the ALJ found that Sherman had no relevant past work. (Tr 47-48). The ALJ then found at Step 5 that Sherman could perform jobs that existed in significant numbers in the national economy, such as agriculture picker, laundry laborer, and kitchen helper. (Tr. 30-31). Having reached these conclusions, the ALJ determined that Sherman had not met the demanding showing necessary to sustain this claim for benefits and denied this claim.

This appeal followed. (Doc. 1). On appeal, Sherman challenges the adequacy of the ALJ's decision arguing the decision was not supported by substantial evidence due to the ALJ's erroneous treatment of the medical opinion evidence, as well as his failure to present all of her credibly

established limitations in a hypothetical to the Vocational Expert. (Doc. 10 at 4-5).[2]

As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision is supported by substantial evidence, and we will affirm the Commissioner's denial of this claim.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

---

[2] Sherman briefly raises an argument related to the ALJ's consideration of the Medical Vocational Guidelines (doc. 10 at 5) but fails to develop that argument in either of her briefs, and so we do not reach consideration of it here.

adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

17

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

**B.**    <u>**Initial Burdens of Proof, Persuasion, and Articulation for the**</u>
<u>**ALJ**</u>

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must

19

sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

20

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ

21

must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, in light of the entire record,

whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in June of 2021, after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and

23

supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's

allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

### D.   The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 139 S. Ct. at 1154.  Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Here, Sherman challenges the ALJ's decision, arguing that he erroneously considered the opinions of Sherman's treating source, Ms. Gulius and the state agency consultant, Dr. Calise. As discussed above, an ALJ is not mandated to accept any medical opinion and is free to evaluate the evidence on record to reach his own conclusions, including conclusions supported by no medical opinion on record.  *Cummings*, 129 F. Supp. 3d at 214–15.  The ALJ has broad discretion to determine which

medical opinions are consistent with and supported by the evidence and credit them accordingly, so long as his decision explains how he reached that conclusion and discusses the consistency and supportability of the opinion. *See* 20 C.F.R. § 416.920c(b).

At the outset, we note that the ALJ found that Ms. Gulius was not an acceptable medical source. (Tr. 22-23). The Rules governing Social Security disability determinations are clear that "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 416.921. Those same rules define "acceptable medical source" as someone in one of eight professional categories , each of which explicitly includes a licensing requirement. *See* 20 C.F.R. § 416.902(a).

Ms. Gulius, who plaintiff initially referred to as "Dr." and "neurologist" in her opening brief, is not a doctor. The record evidence indicates she has a master's degree, but shows no other relevant qualifications, certifications, or licenses. As discussed above, an impairment can only be established by objective medical evidence from an acceptable medical source, and the ALJ here found that Ms. Gulius

was "not an acceptable medical source." (Tr. 22). Ms. Gulius' opinion is therefore definitionally precluded from being the source of an impairment. *See* 20 C.F.R. § 416.921.

In any event, the ALJ did consider Ms. Gulius' opinion and found it unpersuasive.[3] (Tr. 29). The ALJ noted that this opinion seemed to heavily rely on Sherman's self-reported symptoms of paranoia and was generally inconsistent with the claimant's mental health treatment records. (*Id.*). The ALJ further reasoned that while some of the mental health records indicated racing or ruminating thoughts and an anxious mood, Sherman's mental health was "generally within normal limits [and] generally devoid of referrals for more intensive treatment." (*Id.*). The ALJ also noted that this opinion was inconsistent with the treatment records that generally showed no significant clinical abnormalities. (*Id.*).

---

[3] While Sherman appears to argue that this opinion was a treating source opinion entitled to "great weight," we note again that this application was filed after the Social Security regulations were amended in 2017, and accordingly, as we have discussed, the ALJ must consider medical opinions in terms of their persuasiveness, rather than afford a degree of "weight" to each opinion.

We conclude that the ALJ's treatment of Ms. Gulius' opinion is supported by substantial evidence. While not an acceptable medical source, the ALJ considered this opinion and discussed its supportability and consistency with the record evidence. The ALJ explained his reasoning for each, finding that the opinion was both unsupported by and inconsistent with Sherman's treatment records, and accordingly found it unpersuasive. This is all that is required—that the ALJ adequately explain his consideration of the opinion evidence. Thus, we find no error here.

Sherman also argues that the ALJ improperly rejected the opinion of Dr. Calise because this opinion was consistent with the medical records, and further, the ALJ did not discuss the supportability of this opinion in accordance with the regulations. As to this opinion, the ALJ found it "generally inconsistent with the evidence of record[,]" noting that the record contained limited treatment for back pain, mild degenerative findings on imaging, and generally abnormal findings of generally intact to mildly reduced strength and sensation.  (Tr. 27).  The ALJ further noted that the records indicated Sherman's "ability to perform a wide

variety of daily activities." (*Id.*). However, as Sherman notes, the ALJ's treatment of this opinion did not explicitly discuss the "supportability" of the opinion with the medical record. (*Id.*).

We conclude that the ALJ's treatment of Dr. Calise's opinion is supported by substantial evidence. At the outset, to the extent Sherman claims Dr. Calise's opinion was consistent with several specific findings in the record, this appears to be a request that we reweigh the evidence, something we may not do. *Chandler*, 667 F.3d at 359. Further, the ALJ specifically pointed to evidence that was inconsistent with Dr. Calise's opinion. Accordingly, we find that the ALJ adequately explained his reasoning for finding Dr. Calise's opinion inconsistent with the medical evidence.

Further, while the ALJ did not specifically discuss the supportability of Dr. Calise's opinion, we conclude that any failure to specifically use the word "supportability" is harmless error, as we find that the ALJ's decision is supported by substantial evidence in this regard. Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).

Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights'"; that is, if the error "likely affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Here, while the ALJ did not specifically address the supportability of this opinion, the ALJ's decision in this regard as a whole comports with the regulations and is supported by substantial evidence. *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (an ALJ's decision must be read as a whole). Discussing the claimant's alleged physical limitations, the ALJ stated that "the evidence of record does not support greater limitations than those provided herein [,]" which speaks indirectly to Dr. Calise's opinion recommending such limitations. (Tr. 25). Further, Dr. Calise cited "pain in back[,]" "pain in hip[,]" and "migraine headaches" as the specific findings supporting his conclusions. (Tr. 142). In the decision, the ALJ noted that "imaging of the hips … was negative for significant degenerative changes." (Tr. 21). Similarly, the ALJ found "the record reflects very limited treatment for complaints of chronic back pain and diagnostic imaging generally describes only mild degenerative

changes [,]" and that the record "reflects very limited treatment for complaints of back pain during the period at issue[.]" (Tr. 25, 27). Because the decision makes clear that it did not find support for additional limitations, the failure to discuss Dr. Calise's opinion explicitly in terms of its supportability did not affect the outcome of the proceeding. Therefore, any error is harmless and does not necessitate remand. *See Hyer*, 72 F. Supp. 3d 494.

Sherman's final argument is that the ALJ erred in failing to incorporate certain limitations into the hypothetical questions posed to the VE. (Doc. 10 at 17). But the ALJ did not find those limitations to be credibly established. (Tr. 27, 29). As such, he was not obligated to include them in his hypotheticals to the VE. *See e.g., Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) ("[L]imitations that are asserted by the claimant but that lack objective medical support may [be rejected] . . . . if there is conflicting evidence in the record[.]"). Here, there is conflicting evidence in the form of the other medical opinions which did not establish such limitations and which the ALJ found more persuasive,

and so the ALJ did not err in not submitting these limitations in his hypotheticals to the VE.

Although there were some abnormal findings during the relevant period, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154. Given that the ALJ considered all the medical opinion evidence and adequately explained why he found each one persuasive or unpersuasive, we find no error with the ALJ's consideration of the opinion evidence. Similarly, we find no error with the ALJ's hypothetical questions to the VE. Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision will be affirmed.

IV.    <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this

case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

<u>*s/ Daryl F. Bloom*</u>
Daryl F. Bloom
Chief United States Magistrate Judge

Dated: January 16, 2025